I dissent from that portion of the main opinion that concludes that the July 29, 1996, "Agreement for Reimbursement" entered into between David Abston and Congress Life Insurance Company constituted an assignment and/or a subrogation agreement and/or established a lien on, or with respect to, payment of medical benefits that Abston was contractually entitled to receive from Auto-Owners. In pertinent part, that agreement expresses Abston's agreement and intention to reimburse Congress Life (indirectly, through its policy administrator, CBSA) "to the extent of payment received from another for damages relative to the accident." (Emphasis supplied.) Abston also agreed that all medical benefits paid by CBSA would "be secured relative to the accident," that a copy of the agreement might be filed with any third party, and that the agreement would apply regardless of whether "damages" were paid due to legal action, settlement, or otherwise.
The automobile-insurance policy issued by Auto-Owners to Abston contractually obligated it to "pay to or for" him all "reasonable expenses for medical and funeral services" incurred as a result of Abston's sustaining bodily injury in an automobile accident. Abston was injured in a one-vehicle accident involving his Chevrolet truck. No other vehicle or person was involved, and none of the parties assert that there was any other "tortfeasor" against whom Abston could have sought "damages." Auto-Owners acknowledges that, under the circumstances of the accident, Abston was contractually entitled to have paid, and Auto-Owners was clearly contractually obligated to pay, his reasonable medical expenses, either to him or for him. Abston's insurance expert, a professor at the University of Alabama School of Law whose teaching emphasis had been on insurance and tort law (including policy interpretation, principles of subrogation, primary/secondary coverage between insurers, and coordination of benefits between the insurers), testified that the medical-payments-coverage language in the Auto-Owners policy could not be construed *Page 1200 
as providing benefits in the form of "damages." As noted, the agreement between Abston and Congress Life obligated Abston to reimburse CBSA only "to the extent of payment received from another for damages relative to the accident."
The parties dispute whether the agreement between Abston and Congress Life established a right of subrogation, effected an assignment, and/or created a lien. Regardless of its legal effect, however, the Agreement for Reimbursement was never triggered, because Abston never received any "damages" from another. Thus, although Auto-Owners was contractually authorized under the policy to pay medical expenses "to or for" Abston, that authorization would allow it to pay only to him, or "for him," such as to one of his health-care providers. It did not give Auto-Owners permission to make payment to some third-party having no legal right, contractually or otherwise, to receive such payment "for" Abston. Thus, I disagree with the conclusion in the main opinion that "Abston effectively assigned his right to receive the payment from Auto-Owners when he signed the subrogation agreement," and that under the terms of that agreement he "agreed that Congress Life had a valid claim on, and a right to pursue and receive, any amounts — regardless of how they were owed to Abston — that Abston would receive `from another' as a result of the accident." For that reason, I disagree with the derivative conclusion in Part I of the main opinion ("Breach-of-Contract Claim") that, consequently, "Auto-Owners was entitled to a judgment as a matter of law with respect to Abston's breach-of-contract claim." Immediately following that statement appears this sentence, "Consequently, Auto-Owners was also entitled to a judgment as a matter of law with respect to Abston's claim of bad-faith failure to pay." Because I disagree with the premise that Auto-Owners was entitled to a judgment as a matter of law with respect to the breach-of-contract claim, I necessarily disagree with the statement that it was therefore also entitled to a judgment as a matter of law as to the bad-faith claim.
I do agree, however, that Auto-Owners was entitled to a judgment as a matter of law as to the bad-faith claim, but for a different reason. There is no substantial evidence in the record that would permit a conclusion by the jury that the payment by Auto-Owners to Congress Life of the medical-benefits payments owing to Abston was the product of anything other than a mistake or negligence. It is clear from the record, and Abston does not contend otherwise, that Auto-Owners had no ulterior motive in connection with its payment of the medical benefits to Congress Life. Auto-Owners had a maximum liability under the medical-payments coverage of $2,000 and it paid that full amount, i.e., "policy limits," to Congress Life. Abston acknowledged during his trial testimony that he had not personally made a claim with Auto-Owners for the benefits and that he believed that Auto-Owners made only a mistake when it sent the medical payments to Congress Life. Although the subsequent act of Congress Life in refusing to pay all of Abston's medical bills, to the extent of denying claims totaling $2,046 (on the unjustified basis that Abston had failed to make claims for those charges within the 15-month claim window under his Congress Life policy), may have been a breach of its contract with Abston, that wrong cannot be laid at the doorstep of Auto-Owners. It paid in full its policy obligation, albeit to the wrong party, and it was in no way responsible for how Congress Life subsequently chose to apply that payment. Even Abston testified that, after he learned of the $2,000 payment by Auto-Owners to Congress Life, he was not concerned because, among other things, he thought Congress Life would simply apply the money to his medical bills, rather than *Page 1201 
reimburse itself for medical bills it had already paid.
Auto-Owners was not guilty of bad faith, because it did not intentionally refuse to pay the claim with the actual knowledge that there was an absence of any reasonably legitimate or arguable reason for the action it chose to take. It indeed paid the claim, it simply paid it to the wrong party, and its conduct under the circumstances, particularly given Abston's inaction following his receipt of Barrett's August 21, 1996, correspondence to him, was arguably a reasonable interpretation and understanding of the circumstances, or, at worst, the result of negligence or a mistake on its part. State Farm Fire Cas. Co. v. Slade,747 So.2d 293 (Ala. 1999); Ex parte Government Employees Ins. Co.,729 So.2d 299 (Ala. 1999); Georgia Cas. Sur. Co. v. White,582 So.2d 487, 494 (Ala. 1991) ("[M]ere negligence or mistake is not sufficient to support a claim of bad faith; there must be a refusal to pay, coupled with a conscious intent to injure."). Accordingly, I concur with the holding of the main opinion that Auto-Owners was entitled to judgment as a matter of law with respect to the claim of bad-faith failure to pay.
Finally, I concur fully in the respective rationales and rulings, stated in the remainder of the opinion, commencing with Part II ("Fraud Claims"), and including the three subsections ("A. Statute of Limitations," "B. Fraudulent Misrepresentation," and "C. Fraudulent Suppression"), except to the limited extent that there are incidental references to a right of Congress Life under its agreement with Abston to receive the medical payments due him.
Moore, C.J., concurs.